Booth, Chief Justice,
dissenting:
The plaintiff, a captain in the Marine Corps, was detailed to duty on March 28, 1927, with the 6th Begiment of the Marine Corps, “ for special temporary duty beyond the seas with that organization ”, and in due course reached Shanghai, China, in May of that year. He disembarked June 7, 1927, at Tientsin and lived under canvas on the ex-German concession known as the Woodrow Wilson Field until the end of October of the same year. Thereafter and until June 29, 1928, he lived in the Partridge Billet in the British concession. From June 29 to July 25, 1928, he was again under canvas at Hsin Ho, after which he returned to the Partridge Billet and was later transferred to another billet from which he was reembarked for the return to the United States.
The plaintiff contends that the foregoing service under the provisions of section 6 of the act of May 31, 1924 (43 Stat. 250), amending the act of June 10, 1922, and the authorized regulations, constitutes service other than “ field duty ”, and that in the absence of the occupation of appropriate quarters, even though he had no dependents, he is entitled to commutation in the sum of $480.
*636 The provision in question is as follows:
“No rental allowance shall accrue to an officer, having-no dependents, while he is on field or sea duty, * *
The same act authorizes the defining of field or sea duty by the Executive. Under executive regulations “ The term ‘ field duty ’ shall be construed to mean service, under orders, with troops operating against an enemy, actual or potential.”
The plaintiff rests his contention of an assignment to duty other than as defined above upon the definition of the term “ military operations ”, and the citation of certain facts evidencing the friendly and cordial attitude of all factions of the Chinese toward the American Marines, the obligation under orders of the expedition to maintain peace and avoid trouble, the complete absence of any occurrence in this regard, and, therefore, the nonexistence of an enemy, either actual or potential.
The plaintiff’s claim has no real merit. He was assigned to duty with an expeditionary force which was being sent on “ temporary duty beyond the seas ” for the protection of American life and property and the maintenance of treaty rights in China under extremely chaotic circumstances and in the midst of civil war and active and widespread banditry, with results that could not be foreseen and in connection with which the proper authorities of the Government had deemed it necessary that an expeditionary force should be on hand in the emergency for appropriate action as regards the rights secured by treaty, the safeguarding of which could not be otherwise assured. Moreover, the fact that the presence of the Marines in China was deemed to be necessary of itself connotes the existence of that potentiality which threatened American treaty rights and American lives and property, and which, therefore, required the presence in the field of troops for such appropriate action as might be eventually required.
The plaintiff’s detail augmented the American forces then in China to the extent, as found in finding VI, of 4,400 officers and men. This force of armed soldiers was not sent to China to engage in military training nor for the promotion and development of the service. There was no neces *637 sity for detailing a force of such proportions to a station thousands of miles from the United States other than a distinctly military one, i.e., to protect in a military fashion American citizens from a condition of turbulence, disorder, and civil war, which the Government regarded as imminent and which in fact existed in many parts of the country. Doubtless it was due to the presence of this armed and formidable force of American soldiers that violence ceased in the areas occupied by them, and American interests suffered a minimum of danger, but can it be for a moment doubted that if the conditions had been otherwise the soldiers then in China would have protected American citizens and interests in the way the military arm of the nation affords such protection? The soldiers were there for that purpose, and to accomplish it they would have so acted. The submission of the citizenship to the commanding officers and men, the recognition and appreciation of their presence, attested by cooperation with them and the presentation of gifts to them, disclose, as no other fact may, that the American Army in the field was an assurance of protection and a safeguard against the predatory and irresponsible bands who threatened the life and property of our own and native citizens in the country. The American soldiers were sent to assist in suppressing an uprising and they were successful. It would be most unusual to send a large force of American marines across the seas for any other purpose than to protect Americans from actual or potential danger of losing their lives by the violence of enemies then operating in the country where American citizens and soldiers had a right to be.
A potential enemy is one whom the circumstances may develop. Operating against a potential enemy does not in itself require rifle fire, capturing of prisoners, etc. The movement of troops, more especially beyond the boundaries of the United States and its insular possessions, designed to maintain the rights of sovereignty, the rights of treaty, and to protect American lives and property under threat of a violation of the same, cannot be plausibly described by any other terms than “ troops operating against a potential enemy.” It was certainly not garrison duty or field maneuvers. *638 The fact that there was no violation of treaty rights, no loss of lives, or destruction of property, can be more reasonably attributed to the active presence of the Marine force in China than to the unsubstantiated assurance of some of the warring faction of amity and peaceful intentions toward this country and its citizens, which the United States did not regard as sufficient.
It is the general circumstances that must control in construing the intent of Congress in enacting the statutes, even as interpreted by the regulations, and not the exact definitive significance of the terms “ operations ” and “ enemy.” This same thought was clearly expressed in the court’s decision in Stewart v. United States, 70 C.Cls. 540, 543, as follows:
“Although during the period here in question the United States was not at war with Germany, the war having been declared at an end by a joint resolution of Congress, approved July 2, 1921, we think plaintiff was on field duty. Under the terms of the armistice, a part of the American Expeditionary Forces occupied enemy territory and the duties performed by them in Germany as a combatant organization more nearly approach those performed by a regiment in the field than the duties of a regiment permanently garrisoned. Military forces remained in such occupation long after the war had been formally terminated and were only recently withdrawn. The purpose of having such Army of Occupation was to prevent any difficulties that might possibly arise. It was an enemy actual in the past and potential at the time of occupation that warranted action in maintaining an army of occupation in Germany.”
The claims of both Stewart and this plaintiff are covered by the provisions of the act of May 31, 1924 (43 Stat. 250), amending the act of June 10, 1922, by the terms of which Stewart, having dependents who did not occupy Government quarters and he being on field duty, was entitled to commutation of quarters for his dependents, while this plaintiff, being without dependents and on field duty, is precluded from claiming rental allowance, whether quarters were provided for him or not. The decision of this court in Beadle v. United States, 72 C.Cls. 310, is in complete harmony with the foregoing. The plaintiff was doing duty in Nicaragua in organizing a National Guard, with head *639 quarters at Managua, and was engaged in duties described in general orders as being “ on duty without troops.”
The citations supplied by plaintiff are not controlling. There is no similarity in the duties performed by Ferris (United States v. Ferris, 265 U.S. 165) in commanding a regiment in training in this country, with the duty, even though uneventful, of the plaintiff in China. The statutory provisions were entirely different, and the quoted excerpt from the decision of the Supreme Court is of effect only as distinguishing Ferris’s duties from those intended by the act of April 26, 1898.
I am of the opinion that this claim is without merit and that the petition should be dismissed.
Judge Littleton concurs in this opinion.